<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENST CIRCUIT**

BRENDA M. PATTERSON; TIMOTHY
WELKER,

      Plaintiffs - Appellants,

v.

POWDERMONARCH, LLC, a Colorado
limited liability company,

      Defendant - Appellee.

No. 18-1008

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:16-CV-00411-WYD-NYW)**

---

Douglas P. Dowd of Dowd & Dowd, P.C., St. Louis, Missouri, for Plaintiffs-Appellants.

Brian A. Birenbach (Kimberly A. Viergever with him on the brief) of The Rietz Law
Firm, L.L.C., Dillon, Colorado, for Defendant-Appellee.

---

Before **HOLMES**, **McKAY**, and **MORITZ**, Circuit Judges.

---

**McKAY**, Circuit Judge.

Plaintiff Brenda Patterson and her husband, Plaintiff Timothy Welker, appeal from

the district court's entry of summary judgment in favor of Defendant PowderMonarch,

LLC, on their claims of negligence and loss of consortium based on injuries Ms. Patterson allegedly sustained at Defendant's ski resort. Because the district court correctly held that these claims are barred by an exculpatory agreement included on Ms. Patterson's ski lift ticket, we affirm.

## I.

On March 18, 2014, Ms. Patterson made an online payment of $57.00 for a ski lift ticket to use at Monarch Mountain, a ski resort owned and operated by Defendant PowderMonarch. A lift ticket is required for any non-season pass holder at Monarch Mountain to use the resort's ski facilities, such as trails and lifts. After paying for her lift ticket, Ms. Patterson received an email confirmation, which thanked her for her "reservation" and informed her that there would be "NO REFUNDS for any cancellations under 48 hours." (Appellants' App. at 106–07.) Ms. Patterson testified that she could not print her lift ticket at home, but "had to pick it up when [she] got there." (*Id.* at 116.)

On March 20, 2014, Ms. Patterson went to Monarch Mountain with her husband and other family members. At the resort, either she or her husband physically picked up the ticket she had paid for two days earlier. The front of this lift ticket contained an adhesive sticker, designed to be removed and adhered to a wicket on the ticket holder's clothing, on which Ms. Patterson's name, the ticket type, and a bar code were printed. The back of the lift ticket, like all lift tickets issued by Monarch Mountain on March 20, 2014, contained the word "WARNING," followed by seven paragraphs printed in a small

-2-

font.  (*Id.* at 81.)  The first and fourth paragraphs read as follows:

> **Under Colorado law, a skier[1] assumes the risk of any injury to person or property resulting from any of the inherent dangers and risks of skiing and may not recover from any ski area operator for any injury resulting from any of the inherent dangers and risks of skiing, including:  Changing weather conditions; existing and changing snow conditions; bare spots; rocks; stumps; trees; collisions with natural objects, man-made objects, or other skiers; variations in terrain; and the failure of skiers to ski within their own abilities.**
>
> . . . .
>
> In consideration and exchange for allowing Holder to use the ski area facilities, Holder agrees to **ASSUME ALL RISKS**, whether or not described above, known or unknown, inherent or otherwise, associated with the Holder's participation in the ACTIVITY.  Additionally, Holder agrees **NOT TO SUE** Monarch Mountain, PowderMonarch LLC, its affiliated organizations and companies, the United States Forest Service, and all of their respective insurance carriers, agents, employees, representatives, assignees, officers, directors, and shareholders (each hereinafter a "RELEASED PARTY").  Holder agrees to **HOLD HARMLESS AND RELEASE any RELEASED PARTY** from <u>**ANY AND ALL**</u> liability and/or claims for injury or death to persons or damage to property arising from Holder's engagement in the ACTIVITY, **including those claims based on any RELEASED PARTY's alleged or actual NEGLIGENCE or BREACH of any express or implied WARRANTY.**

(*Id.*)

Monarch Mountain's lift tickets are designed so the ticket holder must interact with this "WARNING" side by peeling it away from the adhesive front of the ticket before the ticket may be used to access the resort's ski facilities.  Ms. Patterson testified that she placed the lift ticket on her person, but she did not read the tear-away back of the

---

[1] The second paragraph of the agreement sets forth a broad definition of "skier," which includes snowboarders and sledders, among others.  (Appellants' App. at 81.)

ticket before or after doing so.

During the course of that day's activities, Ms. Patterson and her son fell as they were unloading from a chairlift. While Ms. Patterson was still lying on the ground, a skier from the next chairlift unloaded from the lift and then collided with Ms. Patterson. Her ski boot hit Ms. Patterson's leg, causing an injury to Ms. Patterson's saphenous nerve that has required extensive medical treatment.

Plaintiffs filed suit in the U.S. District Court for the District of Colorado based on federal diversity jurisdiction. *See* 28 U.S.C. § 1332. In their complaint, Plaintiffs each raised one claim against Defendant PowderMonarch: Ms. Patterson brought a claim of negligence, and Mr. Welker brought a derivative claim of loss of consortium.

The district court held that Defendant was entitled to summary judgment for two separate reasons: (1) application of the release of liability from the back of the lift ticket, and (2) preemption under Colorado's premises liability statute, Colo. Rev. Stat. § 13-21-115. Plaintiffs appeal, arguing both that the district court erred in granting summary judgment in favor of Defendant and that the court should have construed their complaint to raise a non-preempted statutory cause of action under the Ski Safety Act, Colo. Rev. Stat. § 33-44-101 *et seq.*, or Passenger Tramway Safety Act, Colo. Rev. Stat. § 25-5-701 *et seq*.

## II.

We review the district court's summary judgment decision de novo, applying the

same standards as the district court. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). Because this is a diversity action, we apply the substantive law of Colorado to the legal questions at issue in this case. *See id.* In applying Colorado law, we "must follow the most recent decisions of the state's highest court." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007). "Of course, by the principles of stare decisis, we are also bound by our own prior interpretations of state law." *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010). "Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003). Where no controlling decision exists, we must attempt to predict what the Colorado Supreme Court would do, "seek[ing] guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Wade*, 483 F.3d at 666 (internal quotation marks and citations omitted).

Plaintiffs argue that there are two reasons why the lift ticket's exculpatory language should not bar their claims in this case: (1) the addition of a release of liability two days after Ms. Patterson paid for her ticket constituted a contract modification for

which there was no additional consideration, and (2) the exculpatory agreement is invalid

under Colorado law because it was neither fairly entered into nor expressed in clear and

unambiguous language.[2]  We consider each of these arguments in turn.

In *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1109 (10th Cir. 2002), we

considered the question of whether an exculpatory agreement that is received after an

individual has already paid for a recreational activity should be considered a contract

modification requiring additional consideration under Colorado law.  In that case, the

plaintiff purchased a gondola lift ticket and a bike rental coupon at the base of a

mountain.  *Id.* at 1107.  After taking the gondola to the top of the mountain, he went to

the bike rental area, where he received his bicycle and was presented with a rental

agreement containing exculpatory language.  *Id.*  He signed this agreement without

reading it completely, then was injured while riding the bicycle down the mountain.  *Id.* at

1107–08.  In his diversity suit against the recreational company, he argued that the signed

rental agreement constituted a modification of the initial agreement, for which additional

consideration was required, because he did not receive it until after he had already paid

for the bicycle.  *Id.* at 1109.

We rejected this argument in *Mincin*, holding that the rental agreement did not

constitute a modification to the initial agreement and thus no additional consideration was

---

[2] Like Colorado courts, we treat the terms "exculpatory agreement" and "release of liability" as "interchangeable."  *See McShane v. Stirling Ranch Prop. Owners Ass'n*, 393 P.3d 978, 984 (Colo. 2017) (citing *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 468–69 (Colo. 2004)).

required.  *Id.*  We noted that Colorado courts have characterized a change to an agreement as a contract modification "[w]here there is a sufficient time lapse," such as "several months," or "eight months."  *Id.* (citing *H & W Paving Co. v. Asphalt Paving Co.*, 364 P.2d 185, 186 (Colo. 1961); *Hoagland v. Celebrity Homes, Inc.*, 572 P.2d 493 (Colo. App. 1977)).  In *Mincin*, however, "the two events were separated by a matter of minutes and [we]re better considered part of the same transaction."  *Id.*  To support this holding, we quoted the Minnesota Court of Appeals' conclusion that "an exculpatory agreement signed after a fee to participate in a recreational activity has been paid is part of the same transaction and is therefore enforceable without additional consideration other than permission to participate in the activity."  *Id.* (quoting *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 829 (Minn. Ct. App. 2001)); *see also Beehner*, 636 N.W.2d at 825, 829 (enforcing exculpatory agreement signed by plaintiff the day after she purchased ticket for horseback ride).  We further cited to the Washington Court of Appeals' holding that a "release signed by scuba diving student after payment of fee was an integrated part of the whole transaction and was thus supported by original consideration."  *Mincin*, 308 F.3d at 1109 (citing *Hewitt v. Miller*, 521 P.2d 244, 248 n.3 (Wash. Ct. App. 1974)).

Although the separation between the payment and the receipt of the exculpatory agreement in this case is longer than in *Mincin*—two days versus "a matter of minutes," this distinction does not lead us to a different result here.  As an initial matter, we note that the two days at issue here are significantly closer to the minutes at issue in *Mincin*

than the months at issue in *Hoagland* and *H & W Paving*, and we are not persuaded that the Colorado Supreme Court would treat two days as a sufficient amount of time that this exculpatory agreement must be characterized as a contract modification.

Moreover, even aside from the question of timing, we are persuaded based on the nature and circumstances of the transaction that the payment and exculpatory agreement here, as in *Mincin*, are better viewed as part of the same transaction, rather than as a subsequent contract modification. This case, like *Mincin*, involves pre-payment for a recreational activity, followed by receipt of an exculpatory agreement before the recreational activity begins. In *Mincin*, we suggested that the Colorado Supreme Court would follow other state courts' reasoning that an "exculpatory agreement signed[3] after a fee to participate in a recreational activity has been paid is part of the same transaction." 308 F.3d at 1109 (quoting *Beehner*, 636 N.W.2d at 829); *cf. Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1153 (10th Cir. 2016) (noting that Colorado has adopted a "relatively permissible public policy toward recreational releases," "a policy choice that, no doubt, means some losses go uncompensated but . . . also promotes the

---

[3] Although Ms. Patterson did not sign the exculpatory agreement at issue in this case, the parties do not dispute that Colorado law permits contracts to be formed without the signatures of the parties bound by them. *See Yaekle v. Andrews*, 195 P.3d 1101, 1107 (Colo. 2008) (noting that "common law contract principles . . . allow for the formation of contracts without the signatures of the parties bound by them"); *see also Feeney v. Am. W. Airlines*, 948 P.2d 110, 113 (Colo. App. 1997) ("[N]o such signature or other method of acknowledgment was required to accept the . . . terms. Plaintiffs accepted the terms of the travel contract by accepting and using the passenger tickets."). Plaintiffs do not rely on the lack of a signature to distinguish this case from *Mincin*, but rely solely on the difference between the minutes in *Mincin* and the days here.

output and diversity of recreational services consumers may enjoy"). Furthermore, the specific circumstances in this case support the conclusion that the release of liability "was an integrated part of the whole transaction," *Mincin*, 308 F.3d at 1109 (citing *Hewitt*, 521 P.2d at 248 n.3). In this case, as in *Mincin*, the facts indicate that the plaintiff was aware the transaction was not complete at the time of payment: In *Mincin*, the plaintiff was "instructed to redeem" a "bike rental coupon" when he reached the rental area at the top of the mountain, 308 F.3d at 1107, while here Ms. Patterson's pre-payment for the lift ticket gave her only a ticket "reservation," not the ticket itself, and she knew the actual ticket had to be picked up from the resort (Appellants' App. at 106–07). Thus, as in *Mincin* and the recreational cases cited therein, Ms. Patterson's receipt of her lift ticket on March 20 is "better considered part of the same transaction," 308 F.3d at 1109, as her payment for the ticket reservation on March 18. We accordingly hold that no additional consideration was required for the lift ticket's exculpatory language to be enforceable.

We turn then to Plaintiffs' argument that the lift ticket's exculpatory agreement is invalid under Colorado law because it was neither fairly entered into nor expressed in clear and unambiguous language.

Colorado courts consider four factors to determine whether an exculpatory agreement is valid: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623

P.2d 370, 376 (Colo. 1981). "Even more specifically, the Colorado Supreme Court has explained that the first two *Jones* factors focus on public policy questions—asking whether 'the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity.'" *Espinoza*, 809 F.3d at 1153 (quoting *Jones*, 623 P.2d at 376) (brackets omitted). "Meanwhile, the latter two factors focus on more party- and contract-specific questions—asking whether the release was fairly obtained and clearly and unambiguously expressed." *Id.* "If the release satisfies both sets of questions," and if it is otherwise a valid contract, "it may be enforced." *Id.*

It is undisputed that the exculpatory agreement here satisfies the first two factors of the *Jones* test, which are generally inapplicable to "'businesses engaged in recreational activities.'" *Id.* (quoting *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004)). However, Plaintiffs contend that the release of liability was neither fairly entered into nor expressed in clear and unambiguous language, and they therefore argue that it is unenforceable under *Jones*.

"A contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence." *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 949 (Colo. App. 2011). In *Espinoza*, we held that an exculpatory agreement for a rafting activity was "fairly entered into" where the plaintiff signed "a document titled in

part 'RAFTING WARNING,'" which detailed several hazards of the recreational activity, added that this description of risks was not complete, and provided that the signer irrevocably and unconditionally released, discharged, and agreed not to sue the company for any and all claims and causes of action that might arise. 809 F.3d at 1156–57. We reasoned that "Colorado courts have repeatedly emphasized that individuals engaged in recreational activities are generally expected to read materials like these, and because recreational businesses do not provide 'essential' services of 'practical necessity' individuals are generally free to walk away if they do not wish to assume the risks described." *Id.* at 1157. "Indeed, Colorado courts and this court have consistently found releases provided at the outset of a recreational activity and containing language very much like the one now before us sufficient as a matter of law to supply a fair and full warning within the meaning of the latter two *Jones* factors." *Id.* at 1157–58.

Plaintiffs argue that the exculpatory agreement in this case was not fairly entered into due to the fact that Ms. Patterson's payment for the lift ticket was nonrefundable,[4] and thus she was not "free to walk away," *id.* at 1157, because she would have forfeited the $57 she paid for her lift ticket, plus the travel costs she had incurred to reach the resort, if she had chosen not to accept the release of liability. However, it is clear in

---

[4] The record does not disclose when Ms. Patterson arrived at the resort, and thus it is impossible to determine from the record whether or not Ms. Patterson's receipt of her ticket on March 20 fell within the forty-eight-hour refund window following her payment for the ticket on March 18. We assume for purposes of this appeal that Ms. Patterson would have been unable to obtain a refund of her payment by the time she received the actual lift ticket on March 20.

context that our decision in *Espinoza* used the term "free to walk away" to explain that an individual engaging in a recreational activity, unlike an individual who seeks to obtain housing or other necessities of life, is not constrained to participate and accordingly may opt out of an activity if he is unwilling to accept exculpatory terms. *See id.*; *see also Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 781, 784 (Colo. 1989) (noting that "exculpatory agreements between employer and employee, and between common carriers or public utilities and members of the public are generally held invalid" because of the "obvious disadvantage in bargaining power," while exculpatory agreement relating to horseback riding did not implicate similar concerns and was accordingly enforceable (internal quotation marks omitted)). Plaintiffs do not cite to a single Colorado case—or federal case applying Colorado law—that would support Plaintiffs' interpretation of "free to walk away" to mean free from all costs, rather than free from compulsion or coercion.

To the contrary, our cases have upheld exculpatory agreements for recreational activities even where the facts would suggest that the individual might well have lost money if she had chosen not to engage in the activity upon receipt of the exculpatory agreement. For instance, in *Mincin*, the plaintiff did not receive the exculpatory bicycle rental agreement until after he had already paid for the bicycle rental and taken a paid gondola lift to the rental area at the top of the mountain. 308 F.3d at 1107. However, these previously incurred costs did not factor into our analysis in that case because the plaintiff was not compelled to continue with his previous plan of engaging in the

-12-

mountain biking activity when he was given the exculpatory rental agreement, nor was he otherwise coerced into signing, and this was sufficient for the agreement to be considered fairly entered into under Colorado law. *See id.* at 1111. We have found no cases from either this court or from a Colorado court suggesting that the third *Jones* factor can only be satisfied if an individual would have been able to back out of an optional activity without incurring any costs; rather, all of the pertinent authorities indicate that this factor will generally be satisfied where the contract relates to a non-essential recreational activity, absent evidence of unusual circumstances such as incompetency. *See Espinoza*, 809 F.3d at 1157 (citing *Chadwick*, 100 P.3d at 469); *see also, e.g.*, *Hamill*, 262 P.3d at 949–50 (holding that exculpatory agreement for horseback riding was fairly entered into "[b]ecause horseback riding is not an essential activity," and thus the participant's mother "was not 'at the mercy' of [the recreational company's] negligence when signing the agreement").

Plaintiffs cite to *Stone v. Life Time Fitness, Inc.*, 411 P.3d 225, 229 (Colo. App. 2017), in which the Colorado Court of Appeals held that a fitness club's exculpatory agreement was fairly entered into because "[n]othing in the record indicate[d] that [the plaintiff] could not have taken her business elsewhere and joined a different fitness club or recreation center," nor was there "any other evidence that the parties' relative bargaining strengths were unfairly disparate so as to weigh against enforcing the Agreement." Plaintiffs argue that the *Stone* court thus recognized that an agreement may

-13-

be invalid as unfairly entered into whenever there is "any other evidence that the parties' relative bargaining strengths were unfairly disparate," *id.*, and they argue that the nonrefundable nature of the lift ticket in this case satisfies that test. However, nothing in *Stone* suggests that the appellate court intended to alter Colorado's rule that recreational contracts generally do not give rise to an obvious disadvantage in bargaining power, nor does *Stone* support Plaintiffs' specific contention that nonrefundable expenses are sufficient to avoid this general rule.

Based on our review of the pertinent cases, we predict that the Colorado Supreme Court would find the exculpatory agreement at issue in this case to be fairly entered into due to its recreational nature and the lack of incompetency, compulsion, or other specific evidence that Ms. Patterson was "essentially place[d] . . . at the mercy of the other party's negligence," *Hamill*, 262 P.3d at 949. We therefore affirm the district court's holding that the third *Jones* factor has been satisfied in this case.

As for the fourth *Jones* factor, Plaintiffs raise four reasons why we should hold that the lift ticket's exculpatory language is not clear and unambiguous: (1) the agreement does not define the "ACTIVITY" to which the release applies; (2) the agreement is densely printed in tiny font in red ink on white adhesive paper, rendering the entire document "confusing and indecipherable without magnification"; (3) it is "replete with legal jargon which is confusing and indecipherable to a lay person"; and (4) "[t]he focus and title of the alleged exculpatory agreement is a 'warning' concerning the dangers of

skiing, unrelated to lift operator duties or agreements to release legal rights, and therefore does not clearly and unambiguously state the intent of the parties" to release legal claims. (Appellants' Br. at 28–31.)  We are not persuaded by any of these arguments.

The lift ticket states that "[i]n consideration and exchange for allowing Holder to use the ski area facilities, Holder agrees to **ASSUME ALL RISKS**, whether or not described above, known or unknown, inherent or otherwise, associated with the Holder's participation in the ACTIVITY."  (Appellants' App. at 75.)  Although the exculpatory agreement does not explicitly define the term "ACTIVITY," we are not persuaded that this term is ambiguous in context, where the term first appears immediately following the phrase "[i]n consideration and exchange for allowing Holder to use the ski area facilities," and where the agreement is located on the back of the ski lift ticket whose sole purpose is to allow the ticket holder to use the resort's ski area facilities.  (*Id.*)  As the district court held, "Plaintiff's argument that the clause is ambiguous because the word 'activity' is not defined does not withstand review of the structure, syntax, language, and purpose of the ticket."  (*Id.* at 260.)

As for Plaintiffs' second and third arguments, we are not persuaded that the agreement is confusing or indecipherable.  While the font size is small, it is certainly readable, and key phrases are both capitalized and bolded to attract the reader's attention to the release of liability and other critical information.  Furthermore, we are not persuaded that phrases such as "affiliated organizations and companies," "HOLD

HARMLESS AND RELEASE," and "ANY AND ALL liability and/or claims" are so technical and "abstract" that a reasonable layperson could not be expected to understand the purpose or meaning of the agreement. (Appellants' Br. at 30–31.) In *Brigance v. Vail Summit Resorts, Inc.*, 883 F.3d 1243, 1256, 1262 (10th Cir. 2018), we held that a similarly worded lift ticket waiver was not "overburdened with legal jargon" and was thus enforceable under Colorado law. Other Tenth Circuit and Colorado cases have likewise upheld exculpatory clauses containing similar language. *See, e.g.*, *Espinoza*, 809 F.3d at 1157 (upholding agreement which included phrases such as "the undersigned hereby irrevocably and unconditionally release[s], forever discharge[s], and agree[s] not to sue . . . with respect to any and all claims and causes of action . . . which could be asserted [by] the Undersigned in connection with . . . the Activity" (alterations in original) (capitalization standardized)); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 135 (Colo. 1998) (finding no ambiguity in an exculpatory agreement which included phrases such as "I do hereby release that Company, its officers, directors, shareholders, employees, and anyone else directly or indirectly connected with that Company from any liability in the event of any injury or damage of any nature" and "an equine professional is not liable for an injury . . . resulting from the inherent risks of equine activities"); *Hamill*, 262 P.3d at 948, 951 (holding that agreement's "legal jargon [wa]s minimal" where it included phrases such as "indemnify and hold harmless" and "hereby release and waive any claim of liability" (emphasis omitted)).

We are also unpersuaded by Plaintiffs' argument that the agreement failed to put reasonable lay persons on notice that it might include a release of liability due to its "WARNING" title and alleged focus on the risks of skiing rather than on the release of liability or on the potential risks posed by ski lifts. We note that the title and first paragraph of PowderMonarch's lift ticket were mandated by Colorado law. *See* Colo. Rev. Stat. § 33-44-107(8)(b)–(c). In *B & B Livery*, the Colorado Supreme Court considered the argument that a release agreement for horseback riding activities was ambiguous because it contained a mandatory statutory warning "as well as a broader clause limiting liability from non-inherent risks." 960 P.2d at 138. The court rejected this argument, holding that "[b]ecause every equine release agreement limiting liability must contain the mandatory warning, . . . the insertion of a broader clause further limiting liability does not make the agreement ambiguous per se." *Id.* The agreement here contains at least as many paragraphs focused on the legal release of liability as on the risks of skiing, and the fourth paragraph of the agreement clearly and unambiguously expresses the intent to extinguish liability for any and all claims that might arise from the ticket holder's use of the ski area facilities. As in *B & B Livery*, the release agreement is "not inordinately long and complicated," *id.*, such that a reasonable lay person could not reasonably be expected to see or understand the release of liability contained in the middle section of the one-page agreement. Additionally, several key terms of the fourth paragraph are both bolded and capitalized to draw the reader's attention to the release

-17-

provisions.

We are not persuaded by Plaintiffs' contention that the exculpatory agreement was unclear or ambiguous because it did not specifically detail that it would release claims arising out of Defendant's employee's allegedly negligent operation of the ski lift. The agreement releases "any and all liability and/or claims" arising out of the ticket holder's use of the ski area facilities, "including those claims based on any released party's alleged or actual negligence." (Appellants' App. at 81 (emphasis omitted).) "Released party" is specifically defined to include "Monarch Mountain, PowderMonarch LLC, . . . and all of their respective . . . employees." (*Id.* (emphasis omitted).) Moreover, the ticket holder agrees to "assume all risks, whether or not described above, known or unknown, inherent or otherwise." (*Id.* (emphasis omitted).) In *Brigance*, we rejected the argument that a very similar provision in a different lift ticket was ambiguous. We held that the meaning of this provision was clear: The "holder of the ticket is to assume all risks of skiing, whether inherent to skiing or not." 883 F.3d at 1257. The release agreement in this case is likewise clear, and we are persuaded that it unambiguously applies to the claims at issue in this case.

We accordingly conclude that the exculpatory lift ticket agreement is enforceable under *Jones*, and we therefore affirm the district court's entry of summary judgment in favor of Defendant on Plaintiffs' negligence and loss-of-consortium claims. Because we affirm the summary judgment ruling on this basis, we need not address the district court's

alternative holding that these claims are also preempted by Colorado's premises liability statute. As for Plaintiffs' argument that the district court erred in failing to construe their complaint to include a third claim based on the Ski Safety Act or Passenger Tramway Safety Act, Plaintiffs do not dispute Defendant's contention that any such statutory claim would be barred by the exculpatory agreement, if enforceable. *Cf. id.* at 1259–60 (rejecting argument that ski lift ticket waiver was unenforceable because it conflicted with Ski Safety Act and Passenger Tramway Safety Act). We therefore reject this argument based on the enforceability of the exculpatory agreement and do not address the parties' other arguments on this point.

## III.

The district court's decision is accordingly **AFFIRMED**.